Date signed July 09, 2009



**ROBERT A. GORDON**
**U. S. BANKRUPTCY JUDGE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Baltimore

In re:                                        *

James Paul Quillen, Jr.                       *        Case No. 06-15938-RAG
                                                       Chapter 7

      Debtor                           *

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

### AMENDED MEMORANDUM OPINION[1]

### I.     Preliminary Statement

The questions presented by James P. Quillen's (Debtor) *pro se*, eve of conversion attempt to exempt literally all of the property interests he brought with him into his failed Chapter 11 bankruptcy case by way of his Amendment to Schedule C (Amended Exemption Schedule) (Dkt. No. 261) pursuant to 11 U.S.C. § 522 are many.[2]  Considerable effort is required to sift through the knotty tangle of claims, contentions, charges and countercharges leveled by the parties to get at the heart of the material facts.  Then, after the factual wheat is separated from the rhetorical

_____

[1] This Amended Memorandum Opinion (Opinion) has been prepared to correct a footnote numbering error in the original Memorandum Opinion beginning after footnote 28.

[2] Hereafter, all statutory citations are to the Bankruptcy Code (Code), found at Title 11 of the United States Code, unless otherwise noted.  All references to Rules are to the Federal Rules of Bankruptcy Procedure.  F.R. Bankr. P. 1001 *et seq.*

chaff, a significantly greater challenge arises in attempting to discern the correct interpretation of the governing law.  In this subject area, the undeniable contradictions between the relevant statutes and rules have left the bankruptcy system with a tangled thicket of conflicting reported decisions.

The thorny, fundamental question presented is whether following conversion from a Chapter 11 case to one under Chapter 7, the deadlines for objecting to exemptions set forth in Rule 4003(b) automatically re-set such that the trustee and creditors are granted two additional thirty day periods to object to amended exemptions previously listed by the Debtor. The Court has concluded that the answer to this question must be 'no'. Nevertheless, the Court also concludes that while the Debtor's interpretation of the law on that issue is correct, ultimately the Estate will not suffer due to the settled legal restrictions upon the Debtor's ability to exempt tenants by the entirety property and, moreover, the self assigned exemption values that limit Debtor's exemptions to the monetary amounts assigned.

Debtor's argument on the question of timeliness unfolds as follows:

(a) In any bankruptcy case, there is one, and only one, Section 341(a) meeting of creditors;

(b) As there is only a single meeting of creditors under Section 341(a), the thirty day time periods for the filing of objections to exemptions set forth in Rule 4003(b) are only triggered by two events – once when the initial Section 341(a) meeting is concluded and thereafter when an amendment to the list of exemptions is filed;

(c) In this case, the deadline for objecting to the Debtor's Amended Exemption Schedule expired thirty days after that list was filed and any objections filed thereafter were untimely; and,

(d) Accordingly, as the objections to at least a portion of his Amended Exemption Schedule were untimely, the subject property re-vested in him by operation of law and is now held by him free and clear of any claims of the Estate.

2

Because he battles them on the merits, Debtor seems to concede that even under his analysis timely objections were filed with respect to the alleged tenants by the entirety exemptions included in the Amended Exemption Schedule.  However, as to all the other property claimed exempt, Debtor relies upon the holding of *Bell v. Bell (In re Bell),* 225 F.3d 203 (2nd Cir. 2000) and contends that the deadline for filing any further objections expired thirty days after the filing of the Amended Exemption Schedule, that those exemptions are therefore conclusively established and the objectors are forever barred from contesting his non-tenants by the entirety exemptions.[3]  By the Debtor's reckoning, what this means is that all of that property, no matter how much of its value he claimed to exempt, is now his free and clear of any adverse claims.

The Court disagrees with the construction of the relevant law expressed in *Bell* pursuant to which the Second Circuit concluded that a Section 341(a) meeting of creditors only occurs once in a given bankruptcy case.  To the contrary, a second, fully robust, meeting of creditors in a converted case is a statutory imperative. Nevertheless, while the Court disagrees with the *Bell* Court on that point, it must also be acknowledged as to the narrower question of timeliness that the better reasoned analysis of the relevant law leads to the conclusion that the Chapter 7 Trustee's second objection to the Debtor's Amended Exemption Schedule came too late. This is so because even in light of the Debtor's obvious attempt at manipulating the Code and Rules to his advantage, and the apparent injustice created from a holistic policy standpoint, it is undeniable that at least a portion of the property sought to be declared exempt did re-vest in him

---

[3] In this regard, Debtor also purports to rely upon *Taylor v. Freeland & Kronz*, 503 U.S. 638 (1992) and his interpretation of how its inflexible construction of Rule 4003(b)'s deadline should be applied in this dispute.  Debtor would have this Court apply *Taylor's* holding in such a way so as to not only foreclose untimely objections but also to deem all of the subject property conclusively exempt in his favor regardless of the value claimed exempt, the market value of the property or the statutory exemption limits on dollar amounts.

by operation of law after he filed the Amended Exemption Schedule as no objection to the specific exemptions in question was filed in a timely fashion.[4]  In the absence of any countervailing substantive law that would operate to bring the property back into the Estate, this Court is hard pressed to see how the Debtor can be divested of the same by an objection lodged well over thirty days after the Amended Schedule of Exemptions was filed. Therefore, the balance of the Debtor's arguments must also be dealt with. These are:

1.    That as a matter of law, property owned by Debtor and his wife as tenants by the entireties is fully exemptible and therefore free from any claims of the Estate;

2.    That to the extent the objecting parties seek, by way of allegations of fraud and the like, to deprive his wife of any presumed property rights she may have in claimed entireties property, an adversary proceeding, joining her as a defendant, must be filed;

3.    That he may utilize the exemptions available in the state of Florida, instead of those provided in Maryland, as a result of his relocation to that state;

4.    That notwithstanding his valuation of either the exemption or the subject property by a set figure (including one market valuation of 'zero'), his exemptions are neither capped nor limited by any dollar value ceiling and he is entitled to exempt the full property interest, whatever that value might be once allowed.[5]

---

[4] At this point, it would be worthwhile to note that the Debtor was once an attorney. He was disbarred by consent in 2007 as a result of a misrepresentation made prior to the filing of this case. Moreover, the Court's overall impression of the Debtor's character, gleaned from the numerous hearings presided over in this case, is that he is readily willing to behave in a dishonest or craven fashion if, in his mind, the ends justify the means.  For example, in one relatively recent trial the Debtor explained to the Court why, in a certain context in the real estate business, it is entirely acceptable to make false representations compared to other areas where a standard of honesty is to be observed.

[5] For the balance of his arguments Debtor shoulders a scattergun, firing away in a haphazard manner in all directions at once.  Save for number 2, the arguments listed above fall just above the fault line of frivolousness.  The rest of Debtor's contentions are not worthy of serious response.

The Court agrees that to the extent the objectors endeavor to attack the integrity and legitimacy of the asserted tenants by the entirety estate, and thus void the Debtor's wife's claimed interest in such property, they must file an adversary proceeding and join her as a defendant to afford her fundamental due process. That civil action was filed and the resulting Adversary Proceeding, No. 08-00711, is pending.  As for the rest of the Debtor's arguments the Court rules as follows for the reasons detailed below:

1.    Applying the plain meaning of the relevant Code provisions, and the logical result that follows, a second Section 341(a) meeting of creditors must occur following conversion from Chapter 11 to Chapter 7;

2.    As a portion of the property sought to be exempted by Debtor on the eve of the consensual conversion was severed from the Chapter 7 estate to re-vest in the Debtor thirty days after the filing of the Amended Exemption Schedule as mandated by the tandem operation of Section 522(l) and Rule 4003(b), the Trustee's Amendment to Objection to Debtor's Amended Schedule C Property Claimed as Exempt (Amended Objection) (Dkt. No. 381) filed on October 29, 2007 was untimely;

3.    Nevertheless, pursuant to long settled law in this Circuit, the Trustee may administer property that is claimed to be held as tenants by the entirety for the benefit of joint creditors and that administration shall be permitted whether the Trustee filed a timely objection or not;

4.    Debtor, a Maryland resident for the relevant statutory period, may only utilize exemptions provided by Maryland law and may not use exemptions available to Florida residents;

5.    At best, the total value of Debtor's permissible exemptions shall be limited by the dollar amount ceilings he assigned to the items of property he seeks to exempt.

## II.    **Factual Background**

On September 26, 2006 (Petition Date), Debtor filed his Voluntary Petition under Chapter 11 of the Code.  At that time, he was represented by counsel.  In standard parlance, the

filing was "bare bones", with the Debtor providing only those documents necessary to meet the minimum standard of case filing legitimacy. On October 6, 2006, Debtor filed an Application for Enlargement and Extension of Time to File Schedules and Statement of Affairs (Application) (Dkt. No. 18).  Therein, the Debtor averred in relevant part that:

> 3.    The Required Filings are now in preparation.[6] Accuracy requires that the Debtors [sic] assemble various original records and documents, from which the necessary detail may be gathered.

> 4.    The detail is now being gathered and organized, but the extent of such detail requires additional time for accurate schedule preparation due to the complicated nature of the Debtor's business...

Application ¶ ¶ 3-4.

Debtor also indicated that he expected to lodge a request that his first meeting of creditors, initially scheduled for October 18, 2006, be postponed due to the complexity of his financial affairs and the sheer volume of recorded information that he needed to produce.[7]  The Statement of Financial Affairs (SOFA) and Schedules were filed on November 2, 2006 (Dkt. No. 40). True to the Application's prediction, the SOFA runs to sixteen pages and the Schedules total 152 owing mainly to the numerous sheets of supplemental attachments. As an example of the layers of depth of the Debtor's financial affairs, in response to Question 18a of the SOFA Rider 18a lists approximately seventy-seven "entities owned" by the Debtor with approximately

---

[6] Debtor collectively referred to his anticipated Schedules of Assets and Liabilities, Statement of Financial Affairs, List of Executory Contracts and List of Equity Security Holders as the "Required Filings".

[7] There is no indication on the docket as to who made the request, but on October 12, 2006 the Debtor's Section 341(a) meeting was continued from its original date to November 8, 2006.  Debtor's counsel was, however, directed to give notice of the re-scheduled date and certify the same thereafter.  No further notice of continuance or rescheduling appears on the docket. Nevertheless, the first Section 341(a) meeting of creditors began, and apparently was concluded, on November 21, 2006 (Dkt. No. 51).

eighteen of those identified as single asset real estate entities. This depth is amplified in the

Schedules where it is asserted that the Debtor owns, or has an interest in, real estate totaling

$3,300,000 in value and personal property with a total value of $905,500. On the other side of

the ledger, Debtor asserted that he has approximately $4,048,841 in secured obligations and

$62,435,140.52 in unsecured debt.

Debtor's SOFA did not identify the precise nature of his prepetition business.  However,

the Court has come to understand from subsequent documents and evidence adduced at hearings

that the Debtor made his living as a real estate developer. This conclusion is confirmed by the

filing of eight other Chapter 11 cases at or near the time of the filing of Debtor's case all of

which involved distressed real estate businesses that he either owned or controlled. All of these

cases turned out to be complete failures as business reorganizations. Most of them never showed

any real signs of life at all. Hence, it is evident that at the time Debtor filed his bankruptcy case,

his personal and business financial affairs were both extremely complex and decidedly troubled.

However, one aspect of the Debtor's case that was not at all complicated at the time he filed his

Schedules was the identity and value of the property he intended to claim as exempt. Debtor's

Schedule C, Property Claimed as Exempt (Schedule C), lists only "Books, Pictures and Other

Art Objects; Collectibles" and assigns a total exemption value of $12,000 out of a total, self-

assigned market value of $600,000 (Dkt. No. 40).[8]  No objections were ever lodged to this list of

exemptions by any creditor or party in interest.

On the joint motion of several creditors, the Court held a hearing on July 17, 2007 to

decide whether to convert this case to one under Chapter 7 and appoint a trustee. After the

presentation of evidence and argument, the Court took the matter under advisement and indicated

---

[8] For the description of the property claimed exempt, Debtor wrote "various items see attached schedule"   However, there was no attachment to Schedule C.

an oral ruling would be made on July 23, 2007. However, the matter became moot when the

Debtor instead consented to conversion on July 19, 2007 (Dkt. No. 253).  On July 24, 2007, two

days before the order converting the case was actually entered, Debtor, now acting *pro se*, filed

the Amended Exemption Schedule.  On that document, Debtor listed a vast amount of real and

personal property including all of his jewelry and artwork, a boat slip and condominium in

Naples, Florida, all of his household goods and furnishings, a bank account and apparently all of

his other personal assets including his business ownership interests and his interest in the Quillen

Revocable Trust.[9]  In short, it appears that the Debtor listed all of the property that he bought

with him into bankruptcy on the Amended Exemption Schedule.  Moreover, Debtor indicated

that the Amended Exemption Schedule was intended to supplement his Schedule C presumably

meaning that he was still seeking to carve out the $12,000 in "Books, Pictures and Other Art

Objects; Collectibles" originally exempted.

Debtor divided the identified property into two general categories: property that he

claimed was owned by he and his wife Karen as tenants by the entirety and property he claimed

to own individually.  For the property alleged to be owned as tenants by the entirety, the gross

total exemption and market values assigned was averred to be the same—$2,581,000.  For the

individual property, the assigned exemption value was given as $18,000 while the market value

fixed at $7,000.[10]  A copy of the Amended Exemption Schedule is reproduced in Appendix "A"

attached to this Opinion.

---

[9] Of all the property listed, it appears that Debtor's business ownership interests and his
interest in the Quillen Revocable Trust, in addition to his cars and wearing apparel, are the only
items that he does not claim to own as tenants by the entirety.

[10] Debtor's trust and business interests were given a market value of 'zero' while Debtor
simultaneously claimed an exemption of $11,000 for the same.

The Order Converting Case from Chapter 11 to one under Chapter 7 on Motion of Third Party and with the Debtor's Consent (Order Converting Case) was entered on July 26, 2007 (Dkt. No. 260).[11]  On July 30, 2007, the Clerk issued a Notice of Chapter 7 Bankruptcy Case, Meeting of Creditors, and Deadlines (Notice) (Dkt. No. 267).  Pursuant to the Notice, a meeting of creditors pursuant to Section 341(a) was scheduled for August 28, 2007.  The Notice also fixed a deadline of thirty days after the "*conclusion* of the meeting of creditors" for the filing of objections to exemptions (emphasis in original).  There is no dispute that the issuance of this Notice, and the scheduling of relevant dates and deadlines following conversion, is the standard practice in this District.[12]

On August 23, 2007, or thirty days after the filing of the Amended Exemption Schedule, creditor Mercantile-Safe Deposit and Trust Company (PNC Bank) filed its Objection to Exemptions Asserted by Debtor as to Certain Property (PNC's Objection) (Dkt. No. 292).[13]  Likewise on the same day, the Trustee filed an Objection to Debtor's Amended Schedule C Property Claimed as Exempt (Trustee's Objection) (Dkt. No. 294).  At that time, Debtor's converted Section 341(a) meeting of creditors had not yet begun, let alone concluded.

Based upon information gained during the Chapter 11 phase of this case, PNC Bank provided the substantive basis that underpins both Objections.  The Trustee's Objection merely

---

[11] The Amended Exemption Schedule and Order Converting Case were erroneously entered out of order.

[12] Also on July 30, 2007, Richard M. Kremen, Esquire, a trustee panelist, was appointed Chapter 7 Trustee.  On August 9, 2007, Mr. Kremen formally resigned from his post and was removed from the case.  Mr. Guttman, also a panelist, was appointed substitute Trustee on the same day.

[13] During the pendency of this case, PNC Bank became the successor-in-interest to Mercantile Safe Deposit and Trust Company.  All subsequent papers of that objector have been filed in PNC Bank's name.

incorporates the Bank's assertions.  PNC Bank asserted that Debtor could not legitimately use

the tenants by the entirety exemption for any of the property that he sought to cover with that

special blanket.  This was so, the Bank claimed, because the Debtor had (a) used the assets of his

business entities to purchase the property, (b) purchased the property at a time when either he or

the business entities were insolvent and thus the resulting transactions should be considered

voidable fraudulent transfers, (c) purchased much of the property in his name alone, and (d) that

the inherent nature of certain items of property disqualified them from being held as tenants by

the entirety.  Neither PNC Bank nor the Trustee lodged specific objections to the Debtor's

attempted exemption of his interests in either the Quillen Revocable Trust or his various business

interests.[14]  The Trustee, however, did make it clear that he was filing the Objection as much to

preserve his rights to file later objections—a place holder, as it were—if necessary with the

prescient expectation that the Debtor would claim that any objection filed after August 23, 2007

was untimely.

　　　　The two Objections were answered by a twenty-five page, unsworn response from the

Debtor (Response) (Dkt. No. 308). Not surprisingly, Debtor's opening salvo was to argue that

since the two Objections did not expressly contest the exemption of his trust and business

interests, his right to exempt those assets was 'conclusively established' as any subsequent

objection would now be time barred.  The Debtor then went on to explain in narrative, and often

overly graphic form, why the tenants by the entirety exemption applied to the rest of his

---

[14] The Trustee subsequently argued that the 'Wherefore' clause of his Objection should
be interpreted as an omnibus objection to all of the Debtor's claimed exemptions.  *See*
Supplemental Memorandum in Support of Trustee's Objections to Debtor's Exemptions (Dkt.
No. 441 ¶ 8). It would, however, stretch the limits of interpretation a mite to thin to take that
liberal a view.  The substance of the Trustee's Objection (incorporating PNC's Objection) was
focused solely upon the fraud allegedly underlying the claimed tenants by the entirety
exemptions and nothing more.

contested assets.  This included meticulously detailed descriptions of the events leading up to the purchase of various items and his explanation of why each became a part of his marital estate.

Nevertheless, he also freely admitted that his business entities either purchased, or ultimately paid for, (by paying accrued personal credit card balances, for instance) virtually all of the subject property.  As between the Debtor and his wife, on the one hand, and the various entities, on the other, the precise pigeonholes that these prepetition payments fit into – salary, distributions, loans or something else altogether – has never been clearly defined in the papers. Nevertheless, in order to establish the Debtor's ordinary course of affairs in this regard, PNC attached to its Objection several transcript excerpts from his Rule 2004 examination.  Taken as a whole the testimony seems to establish that in this context the Debtor used his general management entity, Quillen Development, Inc. (QDI), as something akin to a railroad freight yard; i.e., money generated by different projects, managed directly through individualized single asset companies all controlled by the Debtor, would flow into QDI only to thereafter flow out to other payment destinations deemed, necessary, convenient or expedient by the Debtor at a given point in time.  As reflected in the Rule 2004 transcripts, this included substantial payments that directly benefitted he and his wife.[15]

The same day the Debtor also filed, among other papers, a Motion to Order Chapter 7 Trustee to Turnover Proceeds of Exempt Property to Debtor (Turnover Motion) (Dkt. No. 305). The Turnover Motion sounded a theme that was to be repeated by the Debtor in a number of different ways through several subsequent filings.  Its focus fell upon the remaining proceeds

---

[15] Around the same time the Response was filed, Debtor also filed four other papers. Three were frivolous while one was less so.  They consisted of a motion seeking a Rule 2004 examination of the Trustee (Dkt. No. 303), a motion to remove the Trustee (Dkt. No. 306), an objection to the Trustee's application to employ counsel (Dkt. No. 307) and the Turnover Motion discussed in the next paragraph of the text.  The Debtor withdrew papers 303, 306 and 307 in writing on October 10, 2007 (Dkt. No. 365).

resulting from the post petition, pre-conversion sale of a .73% interest held by the Debtor in an entity known as Crossroads Gaming Resort and Spa, L.P. (Crossroads).[16] Crossroads' purpose was to own and operate a gambling casino in Pennsylvania. Early on in the Chapter 11 proceeding, the Crossroads Interest was sold pursuant to a consensual Order Authorizing Debtor to Sell Property of the Estate (Dkt. No. 66). The sale was triggered by the Debtor's bankruptcy filing and the corresponding ignition of his fellow interest holders' option under their written agreement to buy the Crossroads Interest for the value of Debtor's original investment.[17] After payment of certain administrative expenses, the remaining balance held in escrow by the Trustee at that time from that sale was $121,063.24. The Debtor wanted to get his hands on that money immediately and strongly expressed that desire in the Turnover Motion and several different papers that followed.

In his response to the Turnover Motion, the Trustee asserted the following arguments.

1.  That as he was seeking the recovery of money or property, Mr. Quillen had to file an adversary proceeding to properly assert his claim;

2.  That Mr. Quillen's right to exempt the Crossroads Interest was not yet 'conclusively established' in light of the pending Objections;

3.  That the deadline to object to Mr. Quillen's exemptions had not yet expired as his Section 341 meeting of creditors had not yet been concluded, and;

---

[16] Debtor's interest in Crossroads will hereafter be referred to as the 'Crossroads Interest'.

[17] The details underlying the transaction and the Debtor's request for approval of the buy-back are set forth in the Motion for Authority to Sell Property of the Estate [Debtor's .73% Interest in Crossroads] (Motion for Authority) (Dkt. No. 49). Debtor had invested $165,000 in Crossroads through a related entity, Chance Enterprises, Inc. (Chance), which entitled him to limited partnership status in Crossroads with a .73% ownership interest. It was the shareholder agreement of Chance that required Debtor to sell back his interest in Crossroads for the original price paid for his investment in the event he became 'unsuitable' to continue as an investor. (Dkt. No. 49); Ex. B at 27-28. As he indicated in the Motion for Authority, his bankruptcy filing rendered him unsuitable in the eyes of his fellow investors and thus the buy-out right for a fixed sum was triggered.

4.      That even if Debtor had a right to exempt some of the proceeds, the entire amount could not be exempted as Mr. Quillen expressly limited his total exemption for all of his business ownership interests to only $11,000.

*See* Trustee's Opposition to Motion to Order Chapter 7 Trustee to Turnover Exempt Property to Debtor (Dkt. No. 339).

While the hornet's nest of charges and counter-charges continued to expand, hearing dates were scheduled in the ordinary course. By notice issued on September 11, 2007, Debtor's Motion to Strike Unauthorized Pleading of Chapter 7 Trustee (Motion to Strike) (Dkt. No. 304) was scheduled for hearing on October 1, 2007. On September 18, 2007, both PNC's and the Trustee's Objections were scheduled for hearing on October 16, 2007 and then were later re-set *sua sponte* for the October 1st hearing date.

Reviewing the docket and relevant papers in advance of the October 1st hearing, it was noted that the Section 341(a) meeting of creditors had not yet commenced.[18] Accordingly, the Court *sua sponte* decided to continue the Motion to Strike and the Objections to a date well after the projected conclusion of the Section 341(a) meeting. That ruling was based upon the conclusion that to permit the Objections to be heard before the Section 341(a) meeting of creditors had even begun would be contrary to the systemic goal (embodied in Rule 4003(b)(1)) of having the Section 341(a) meeting conclude before objections to exemptions are filed and determined. In short, it appeared to the Court at that time that such a backwards process would

---

[18] The first post-conversion Section 341(a) creditors' meeting date of August 28, 2007 was awkwardly rescheduled to occur on September 19, 2007 by notice issued on August 28, 2007. A notice of continuance of the September 19th date was filed by the Trustee's counsel on September 26, 2007 and the meeting appears to have actually commenced on October 17, 2007. A Notice of Continued 341 Meeting of Creditors was filed on October 19, 2007 (Dkt. No. 370), continuing the meeting to December 21, 2007. While no final, written verification was ever filed, it appears that the meeting of creditors was concluded on that date.

deprive the Trustee and other interested parties of the opportunity to investigate the claimed

exemptions in the statutorily mandated fashion and have objections determined in a

comprehensive and efficient manner.  The Section 341(a) meeting of creditors seemed to be the

legislatively prescribed starting point for that investigatory process.  An Order *Sua Sponte*

Continuing Hearing on Objections to Exemptions (*Sua Sponte* Order) was therefore entered on

September 27, 2007 (Dkt. No. 347).  In pertinent part, the *Sua Sponte* Order stated that:

> Upon the conversion of a case from Chapter 11 to Chapter 7, a new
> meeting of creditors must be conducted.  Under Section 348(a), the
> conversion of a case from a case under one chapter of this title to a case
> under another chapter of this title constitutes an order for relief under the
> chapter to which the case is converted.  Section 341(a) provides that
> within a reasonable time after the order for relief in a case under the
> Bankruptcy Code, the United States Trustee shall convene a meeting of
> creditors.  At such meeting, pursuant to Section 343, it is the debtor's duty
> to appear and submit to examination by the trustee and creditors.[19]

*Sua Sponte* Order at 2.  The Objections were therefore continued to a later date to permit the

meeting of creditors to be conducted before the hearing on the Objections was held.  The

October 1st hearing did proceed with respect to the Debtor's Turnover Motion and the Trustee's

Application to Employ Counsel (Dkt. No. 291).  The primary legal issue raised by the Debtor –

whether the time to object to the Amended Exemption Schedule had already expired prior to the

Chapter 7 Section 341(a) meeting of creditors – bubbled up within the context of the Turnover

Motion.  Following argument, the Turnover Motion was orally denied from the Bench.  The

rationale for the ruling followed the brief analysis set forth in the *Sua Sponte* Order: upon

---

[19] The Trustee contends that the *Sua Sponte* Order represents 'the law of the case' and
that therefore Mr. Quillen is foreclosed from raising the timing issue addressed herein.  The
Court cannot interpret the *Sua Sponte* Order to such draconian effect.  The *Sua Sponte* Order was
entered without the benefit of sharpened analysis from the parties and, moreover, without notice
or hearing.  Furthermore, and as will be seen in the Analysis Section below, upon reflection the
Court has determined that the bottom line conclusion of the *Sua Sponte* Order regarding the
interpretation of Rule 4003(b)(1) in this case was wrong.

conversion a new Section 341(a) meeting had to be held and the deadline included in Rule 4003 for filing objections would not expire until, at the earliest, thirty days after the conclusion of that meeting.

During the hearing, Mr. Quillen objected vigorously to the ruling and, for the first time, raised the Second Circuit's decision in *In re Bell,* 225 F.3d 203 (2nd Cir. 2000). Under *Bell's* reasoning, he asserted there was no Section 341(a) meeting of creditors following conversion and therefore, pursuant to Rule 4003(b)(1), the time to file objections to his Amended Exemption Schedule expired on August 23, 2007, or, thirty days after its filing.  As *Bell* had not been brought to the Court's attention in advance, the ruling was not changed. The Court, however, indicated that a written opinion and order memorializing the decision would be prepared and issued.  It was also suggested to the Debtor that if he believed the *Bell* decision was controlling then a motion to alter of amend judgment should be filed once the opinion was entered.

Nevertheless, on October 5, 2007 before a written opinion was entered, Debtor filed a Motion for Reconsideration of Order Denying Debtor's Motion to Compel Trustee to Turnover Proceeds of Exempt Property (Motion for Reconsideration) (Dkt. No. 360). The Motion for Reconsideration (1) asserted all the arguments derived from *Bell* with respect to the timeliness of objections to exemptions and the conclusion that only one Section 341(a) meeting ever occurs in any case, (2) claimed that the value of the Crossroads Interest was zero on the Petition Date and that any 'postpetition' realization of value became the Debtor's property as a part of his exemption, and (3) argued that the assignment of a zero value to property sought to be exempt does not nullify the claimed exemption or any additional value existing at the time the exemption is honored.[20]

---

[20] Shortly after the Motion for Reconsideration was filed on October 10, 2007, the Debtor filed a Motion to Order Chapter 7 Trustee to Turnover Proceeds of Exempt Property to Debtor

Throughout the balance of October 2007, the Trustee and PNC Bank filed the following papers to respond to the legal arguments raised in the Debtor's motions:

1.      Trustee's Opposition to Motion for Reconsideration of Order Denying Debtor's Motion to Compel Chapter 7 Trustee to Turnover Proceeds of Exempt Property to Debtor (Dkt. No. 372);

2.      Trustee's Opposition to Debtor's Motion to Compel Chapter 7 Trustee to Turnover Proceeds of Exempt Property to Debtor (Dkt. No. 377);

3.      PNC Bank, National Association, Successor-By-Merger to Mercantile-Safe Deposit and Trust Company's Opposition to Debtor's Motion for Summary Judgment Regarding Objections to Debtors [sic] Exemptions (Dkt. No. 378); and,

4.      PNC Bank, National Association, Successor-By-Merger to Mercantile-Safe Deposit and Trust Company's Reply to Response by Debtor to Mercantile-Safe Deposit and Trust Company's Objection to Exemptions Asserted by Debtor as to Certain Property (Dkt. No. 379).

On October 29, 2007, the Trustee filed his Amendment to Objection to Debtor's Amended Schedule C Property Claimed as Exempt (Amended Objection) (Dkt. No. 381) which document finally lodged specific objections to Debtor's non-marital estate exemption claims and thus effectively joined issue as regards the question of timeliness.

The Trustee's objections can be summarized as follows:

1.      As claims of joint creditors of the Debtor and his spouse were filed in the case, the Trustee is empowered to administer property owned as tenants by the entirety for the benefit of those creditors pursuant to the long settled law of this Circuit;

---

(Dkt. No. 363). That motion sought a hearing to establish, *inter alia*, that the Crossroads Interest was worth 'zero' dollars on the Petition Date. This assertion ran directly counter to the stark reality that the estate's realization of the money in question arose solely because of the Debtor's bankruptcy filing and the corresponding right to buy back his interest in Crossroads at a fixed sum. The same day, Debtor also filed a Motion for Summary Judgment Regarding Objections to Debtors [sic] Exemptions (Dkt. No. 364). That motion alleged that entry of summary judgment in Debtor's favor was appropriate as to his alleged tenants by the entirety exemptions because no adversary proceeding had been filed against his wife and the documents attached to his Response established that the property was within their marital estate.

16

2.      The Crossroads Interest was not worth zero on the Petition Date and even if it was, the Debtor was limited by binding precedent to exempting only that much in value (equaling nothing, as a practical matter) as that is the market value he assigned to it, and;

3.      The Debtor's exemptions exceeded his statutory, monetary allowances and therefore were excessive.

There followed a series of papers intended to complete the filing cycle.  These are:

1.      Trustee's Opposition to Motion for Summary Judgment Regarding Objections to Debtor's Exemptions (Dkt. No. 382);

2.      Debtor's Motion to Strike as Untimely Trustee's Amendment to Objection to Debtor's Amended Schedule C Property Claimed Exempt (Dkt. No. 398);

3.      Debtor's Motion to Strike (I) Trustee's Objection to Debtor's Amended Schedule C (Docket No. 294), (II) Objection of PNC Bank, N.A. to Exemption by Debtor of Certain Property (Docket No. 292), (III) Trustee's Amended Objection to Debtor's Amended Schedule C (Docket No. 381) and (IV) Reply of PNC Bank, N.A. to Response of Debtor (Docket No 379) for Failure to Comply with Rule 7009 (Dkt. No. 408);

4.      Debtor's Response to Trustee's Amendment to Objection to Debtor's Amended Schedule C Property Claimed as Exempt (Dkt. No. 409);

5.      Trustee's Opposition to Motion to Strike as Untimely Trustee's Amendment to Objection to Debtor's Amended Schedule C Property Claimed as Exempt (Dkt. No. 415);

6.      PNC Bank National Association, Successor-By-Merger to Mercantile-Safe Deposit and Trust Company's Opposition to Debtor's Motion to Strike (I) Trustee's Objection to Debtor's Amended Schedule C (Docket No. 294), (II) Objection of PNC Bank, N.A. to Exemption by Debtor of Certain Property (Docket No. 292), (III) Trustee's Amended Objection to Debtor's Amended Schedule C (Docket No. 381) and (IV) Reply of PNC Bank, N.A. to Response of Debtor (Docket No 379) for Failure to Comply with Rule 7009 (Dkt. No. 417); and finally,

7.      Trustee's Opposition to Debtor's Motion to Strike (I) Trustee's Objection to Debtor's Amended Schedule C (Docket No. 294),

(II) Objection of PNC Bank, N.A. to Exemption by Debtor of
Certain Property (Docket No. 292), (III) Trustee's Amended
Objection to Debtor's Amended Schedule C (Docket No. 381) and
(IV) Reply of PNC Bank, N.A. to Response of Debtor (Docket No
379) for Failure to Comply with Rule 7009 (Dkt. No. 418).

On February 26, 2008, a second hearing was held on all pending matters at which time

the parties were given the opportunity to argue their respective positions in a comprehensive

fashion. The Trustee submitted eleven proofs of claim into evidence to establish the presence of

joint creditors.[21]  Other than that, evidence was essentially limited to the Trustee calling the

Debtor as his only witness and introducing certain documents through him.  The examination

focused upon the Debtor's alleged deceptive non-disclosure of certain post petition monetary

transactions.[22]  Among other things, the Debtor's testimony and the Trustee's presentation led to

the March 11, 2008 entry of an Order Prohibiting Removal, Transfer, Liquidation or other

Disposition of Assets (Order Prohibiting Removal) (Dkt. No. 443).  The Order Prohibiting

Removal was intended to prevent the Debtor from disposing of or transferring a substantial

portion of the property claimed to be exempt.[23]

The parties were invited to file supplemental memoranda within ten days after the

hearing's conclusion.  The Trustee did file a Supplemental Memorandum in Support of Trustee's

---

[21] The claim numbers are 2, 15, 21, 22, 30, 33 – 36, 39 and 46.  All of the claims, save for
No.46, do appear to be claims against both Mr. Quillen and his wife. The joint claims total
approximately $3,904,140.40.

[22] Those transactions, and Debtor's alleged failure to disclose them, formed the basis of
the Trustee's objection to the Debtor's discharge.  That trial in Adversary Proceeding No. 08-
0427, began and was concluded on March 9, 2009.

[23] Ultimately, the Debtor was found to be in contempt of the Order Prohibiting Removal
for doing precisely what the Order forbade – moving the subject property beyond the borders of
Maryland. As a result, an Order Holding Debtor In Contempt and Requiring the Delivery of
Certain of the Debtor's Assets into the Custody and Control of the Trustee was entered on
January 27, 2009 (Dkt. No. 486).

Objections to Debtor's Exemptions (Supplemental Memorandum) on March 7, 2008 (Dkt. No. 441). The Debtor chose not to submit additional papers.  The questions are now ripe for decision.

III.   **Analysis**

    A.   **Jurisdiction and Venue**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334, 157 and Local Rule 402 of the United States District Court for the District of Maryland.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B).[24]

    B.   **The  Deadline for Objecting to the Debtor's Amended Exemption Schedule Expired  Thirty Days After the Filing of the Same, or, August 23, 2007.**

        (a)   *A Second, Fully Robust Section 341(a) Meeting of Creditors is a Statutory Requirement in a Converted Case.*

To determine whether a second Section 341(a) meeting must occur following conversion, one must turn to the statutory language. *United States v. Ron Pair*, 489 U.S. 235, 241 (1989). As stated by the Court in *Ron Pair*, "[t]he plain meaning of legislation [is] conclusive except in the 'rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'" *Id.* at 242 (quoting *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564,571 (1982)).  To the same effect is *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249 (1992), wherein the Court stated, "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Id.* at 253-54.

The initial question presented has come up before in Mr. Quillen's case and hence the same statutory provisions apply. On July 14, 2008, the Court issued a Memorandum of Decision in Support of Order Denying Motion to Dismiss (Memorandum of Decision) in Adversary Proceeding No. 07-0839. *Baltimore County Savings Bank, FSB v. James Paul Quillen* (*In re*

---

[24] Rule 4003(c) places the burden of proof upon the objecting parties.  However, the outcome of this dispute does not turn on the resolution of conflicting evidence.

*Quillen*), 2008 WL 2778881 (Bankr. D. Md.).  The precise question presented for decision was: when does the time to file a complaint for determination of dischargeability of debt under Section 523 expire in the event of conversion of a bankruptcy case from one under Chapter 11 to one under Chapter 7? *Id.* at 1. The answer provided was that, "the time to file a [dischargeability] complaint ... following the conversion of a bankruptcy case from Chapter 11 to Chapter 7 expires 60 days after the first date set for the Section 341(a) meeting of creditors in a converted case." *Id.*

In seeking dismissal of the complaint in that Adversary Proceeding, the Debtor raised the same fundamental argument raised here – there is only one Section 341(a) meeting of creditors in any bankruptcy case and therefore post-conversion deadlines cannot be re-set by reference to a post-conversion Section 341(a) creditors' meeting.[25] This Court disagreed with that proposition and the Memorandum of Decision explains why that conclusion was reached.

The essence of the reasoning behind the decision is as follows:

> Debtor's predicate contention [that there is only a single Section 341(a) meeting of creditors in any case] is fatally flawed.  And that structural defect results in the collapse of his entire argument.  Under Section 301, the filing of a voluntary petition under a chapter of Title 11 commences a case and constitutes an order for relief under such chapter.  Section 341(a) provides that, within a reasonable time "after the order for relief in a case" under Title 11, the U.S. Trustee "shall convene and preside at a meeting of creditors".  Pursuant to Section 343, the debtor is required to appear and submit to examination under oath "at the meeting of creditors under Section 341(a)".  And when a case is converted from the chapter under which it

---

[25] In the Adversary Proceeding, Debtor had no rational choice but to concede that the specific deadline to file exceptions to dischargeability had to reset since Bankruptcy Rule 1019(2) expressly mandates that result. Nevertheless, Debtor argued that since there was no second Section 341(a) meeting of creditors upon conversion, creditors had only sixty days from the entry of the *order of conversion* to file exceptions. Hence, the debate revolved around what Rule 4007 means in the event of conversion and which date must be used as the first day of the applicable time period.

was originally filed to a different chapter, Section 348(a) provides that conversion constitutes "an order for relief under the chapter to which the case is converted".[26]  By contrast, nowhere in the Bankruptcy Code is the Section 341(a) meeting of creditors expressly deemed to be a one time event.

The conclusion this Court must draw from the plain meaning of these connected sections is that the order of conversion constitutes a new order for relief pursuant to Section 348(a) and the new order for relief triggers a new meeting of creditors under Section 341(a). *F&M Marquette Nat'l Bank v. Richards*, 780 F.2d 24, 25 (8th Cir. 1985). This conclusion is firmly grounded in the plain language of the statutes in addition to logic and common sense. Thus, Debtor is wrong when he asserts that no statute or rule affirmatively requires a meeting of creditors post-conversion.  To the contrary, the post-conversion meeting of creditors is a statutory imperative.[27] As the court noted in *F&M Marquette Nat'l Bank*, the "new meeting of creditors" held in the converted case "is not a continuation or extension of the meeting of creditors in the previous chapter 11 proceeding", but instead is "a separate and distinct meeting". *Id.*  This Court agrees with *F&M Marquette Nat'l Bank* and holds that when a bankruptcy case is converted from Chapter 11 to Chapter 7, a new

---

[26] Conversion, however, does not effect a general change in the *date* of the filing of the petition, the commencement of the case, or the order for relief save, for the exceptions contained in Section 348(b) and (c).

[27] Rule 2003 addresses the scheduling of and manner of business conducted at the meeting of creditors.  Rule 2003(a) states that in a Chapter 7 or Chapter 11 case the U.S. Trustee "shall call a meeting of creditors to be held no fewer than 20 and no more than 40 days after the order for relief".  While 2003(a) does not specifically refer to the circumstance of conversion, the Court finds that such omission is practically meaningless.  For the reasons explained in the above text, the requirement for a post-conversion Section 341(a) meeting of creditors is dictated by statute.  It cannot be abrogated by the Rules and the Rules need not address the issue.  *See* 28 U.S.C. § 2075.

Indeed, Rule 2003(a) did not even include a reference to Section 341 prior to the Bankruptcy Abuse Prevention and Consumer Protection Act (BAPCPA) related revisions to the Rules (the Interim revision to Rule 2003(a) contained a brief amendment that references Section 341(e)).  As noted above, the conversion order constitutes an order for relief under the chapter to which the case has been converted and a plain meaning interpretation leads to the conclusion that this triggers a new meeting of creditors.  Rule 2003(a) serves only to set the time for conducting the meeting of creditors, by reference to the order for relief – *not* its date.

> meeting of creditors under Section 341(a) must be
> conducted as a statutory requirement.[28]

*Quillen*, 2008 WL 2778881 at 3.  *See In re Campbell*, 313 B.R. 313, 319 (10th Cir. B.A.P. 2004)

("The conversion of a Chapter 13 case to Chapter 7 requires the United States trustee to call a

new meeting of creditors under § 341(a), § 348(a), and Bankruptcy Rule 2003(a)."); *In re Hines*,

2008 Bankr. Lexis 2419, *7 (Bankr. M.D. N.C. 2008) ("However, when a case is converted from

Chapter 13 to Chapter 7, a new Section 341 meeting of creditors must be held.").

Significant logical strength for the foregoing construction is also supplied by the

operational mechanics of Rule 1019(2). That rule 'implements' Section 348, Fed. R. Bankr. P.

1019, advisory committee's note to 1983 Amendments, reprinted in 9 Collier on Bankruptcy

App. 1019, at 1019-25 ("This rule…implements § 348 of the Code…") and it mandates that

certain deadlines – the time for filing a motion under Section 707(b), a claim, a complaint

objecting to discharge, or a complaint to determine dischargeability of a debt – shall re-

commence upon conversion in accordance with the timing of the same rules that fixed the initial

deadlines when the case began. Those rules - 1017, 3002, 4004 and 4007, respectively – all hark

back to the *first date* set for the "meeting of creditors" required by Section 341(a) for the

commencement of their crucial deadlines.  It therefore does not make any sense at all to conclude

that no Section 341(a) meeting occurs after conversion.  Or perhaps what would be worse, that

the second Section 341(a) meeting can be anything but the fully robust one that the Code

anticipates.  Experienced practitioners, possessed with a holistic understanding of how the

---

[28] The Court's holding is also supported by the linkage between Sections 342 and 348(c). Section 348(c) provides that Section 342 applies in a case converted to Chapter 7 "as if the conversion order were the order for relief".  Section 342(a) commands that notice "of an order for relief in a case" under Title 11 shall be given.  Rule 2002 provides creditors are to be given notice of the order for relief and must receive at least twenty days notice of the meeting of creditors under Section 341.  F. R. Bankr. P. 2002(a)(1) and (f).  Thus, when a case is converted, a new notice of bankruptcy case must be issued and it must contain both the date of the 'order for relief' and the date of the post-conversion Section 341(a) meeting.

bankruptcy system functions, would expect no less. If less were intended, surely Congress would have made that explicit by either saying so or decisively narrowing the scope and dimension of the second Section 341(a) meeting in some manner.

In taking the opposite stance, the Second Circuit in *Bell*, 225 F.3d at 211, relied heavily upon Section 348(a)'s admonition that conversion "does not effect a change in date of . . . the order for relief".  Indeed, that caveat is the linchpin of the entire construct.  Interpreting the timing provisions of Section 341(a) and Rule 2003(a) to be keyed to "the order for relief" and reading Rule 2003(a) as only permitting a strict twenty to forty day window after the order for relief is entered for holding the requisite Section 341(a) meeting, the court concluded that because there is only a single *date* for the order for relief, the relevant Code provisions could only be interpreted as permitting a single Section 341(a) meeting. *Id.* at 211-12. This result is reached by emphasizing above all else the statutory directive that the 'date of' the order for relief is unalterable except for those instances where Congress carves out exceptions and equates the order for relief with the order for conversion.[29]  Hence, the court in *Bell* deemed the Section 341(a) meeting to be a one-time event and any other bankruptcy occurrence that depends upon that meeting for scheduling, timing and vitality can therefore only be governed by the date of the initial Section 341(a) meeting.

---

[29] Sections 348 (b) and (c) supply the list of those express statutory sections. They read in full:

(b) Unless the court for cause orders otherwise, in sections 701(a), 727(a)(10), 727(b), 728(a), 728(b), 1102(a), 1110(a)(1), 1121(b), 1121(c), 1141(d)(4), 1146(a), 1146(b), 1201(a), 1221, 1228(a), 1301(a), and 1305(a) of this title, "the order for relief under this chapter" in a chapter to which a case has been converted under section 706, 1112, 1208, or 1307  of this title means the conversion of such case to such chapter.

(c) Sections 342 and 365(d) of this title apply in a case that has been converted under section 706, 1112, 1208, or 1307 of this title, as if the conversion order were the order for relief.

Obviously, such an analysis cannot be reconciled with the requirements of Rule 1019(2) explained above. Without a post-conversion Section 341(a) meeting, the rule makes no sense and is crippled beyond hope. Moreover, in this Court's view, Section 348(a) *itself* is in effect a self-modifier by deeming the order for conversion to be an order for relief while simultaneously stating that the 'date' of the existing order shall not change. This does not reflect the kind of clarity one would hope for in legislative drafting. Nevertheless, none of the interlaced sections examined in the quote borrowed from the Memorandum of Decision, and which conceive the Section 341(a) meeting, treat the 'order for relief' that results from conversion any differently from the original order for relief that is generated by the commencement of the case. Moreover, none of the Code provisions or Rules relevant to the existence and scheduling of the Section 341(a) meeting are geared to the *date* of the order for relief as opposed to the order for relief itself. Likewise, there is no section in the Code that expressly limits the Section 341(a) meeting of creditors to singular status.

As Section 348(a) offers us an internecine conflict, common sense, rooted in a deep appreciation of how the bankruptcy system operates, demands that the phrase 'order for relief' be given the most holistic interpretation possible in order for the statute to function in a smooth, orderly fashion.[30] That is to say that a second, comprehensive Section 341(a) meeting of creditors is an absolute must in a converted case simply because Congress could not have intended to eliminate such a vital element of the bankruptcy process. If it did, one would rightfully conclude that explicit notice of that sea-change event would be provided.

---

[30] Section 348's purpose is to "leave matters as they existed on the date of conversion." *Robb v. Lybroak* (*In re Lybroak*), 107 B.R. 611, 613 (Bankr. N.D. Ind. 1989), *aff'd* 135 B.R. 321 (N.D. Ind. 1990), *aff'd* 951 F.2d 136 (7th Cir. 1991). So long as no galvanized substantive rights are violated, holding a second Section 341(a) meeting following conversion certainly does no violence to that principle.

The overwhelming policy reasons that support this conclusion in the context of conversion from reorganization to liquidation are detailed in the Memorandum of Decision. *Quillen*, 2008 WL 2778881 at 5-6.[31]  They have been debated back and forth in a wealth of reported decisions.[32]  However, policy reasons, no matter how compelling, would be little more than "castles made of sand"[33] if the plain meaning of the controlling Code provisions did not weave together to lead inevitably to the conclusion that a second Section 341(a) meeting of creditors must occur in a converted case.  So-called 'policy' is better understood as the quantum of the underlying reasoning that sharpens, sketches in, and colors the gray area with a bold, vivid palette to explain why Congress acted as it did.

Nevertheless, while this Court concludes that a second Section 341(a) meeting must occur whenever a bankruptcy case is converted, under the facts of this case I cannot agree with the ultimate point contended for by the Trustee: that the thirty day time periods under Rule 4003(b)(1) reset from the date of the conclusion of that meeting such that the Amended

---

[31] These include the toppling of the debtor in possession under Section 1112 in favor of the appointment of an independent trustee charged with the prime duties of investigation and liquidation and also the metamorphosis of creditor strategies from 'wait and see' to all out combat over the bleached bones of a failed reorganization.

[32] In *In re Hines*, *supra* at *7-*13, Judge Waldrep cites most, if not all, of the decisional law on record, through the date of that decision, on the general question of whether the time to object to exemptions re-sets upon conversion. Virtually all of the cited cases must contend with the preliminary question of whether a second Section 341(a) meeting is mandated by the statutory language as a precursor to the more narrow timing issue. *See, e.g., Campbell*, 313 B.R. at 321-22 (contrasting role of Chapter 13 trustee in confirmation process under § 1325 (a) to Chapter 7 trustee's duty to maximize value for creditors under § 704(a)); *In re Kositphasaj*, 2006 Bankr. Lexis 4426 at *9 (Bankr. D. Md. March 31, 2006) (noting the unfairness of imposing an expired deadline on Chapter 7 trustee); *In re Hopkins*, 317 B.R. 726, 733 (Bankr. E.D. Mich. 2004) (finding the review of exemptions to be more important to a Chapter 7 trustee than a Chapter 13 trustee).

[33] "And so castles made of sand, Slips into the sea, eventually." The Jimi Hendrix Experience, *Castles Made of Sand, on* Axis: Bold As Love (Experience Hendrix, L.L.C./MCA 1997 ) (1967).

Objection can be deemed timely filed. The reasons underlying this decision are explained in the next section.

> (b) *Notwithstanding the Inevitability of a Second Section 341(a) Meeting of Creditors in a Converted Case, As the Deadline for Objecting to the Debtor's Exemptions Expired Thirty Days After the Filing of the Amended Exemption Schedule, the Trustee's Amended Objection was Untimely and as a Portion of the Property Claimed to be Exempt Re-vested in the Debtor, it is Now Held Free and Clear of Any Claims of the Estate.*

Rule 4003(b)(1) provides the deadlines for filing objections to exemptions.  In pertinent part, the rule states:

> A party in interest may file an objection to the list of property claimed as exempt only within 30 days after the meeting of creditors held under Section 341(a) is concluded or within 30 days after any amendment to the list or supplemental schedules is filed, whichever is later.

Fed. R. Bankr. P. 4003(b)(1).  Interpreting each word in accordance with its plain meaning, and applying the above analysis respecting the statutory necessity of holding a second Section 341(a) meeting of creditors following conversion, the rule literally provides for two, fresh thirty day periods to object to exemptions in a converted case.  However, the rule also states with equal vigor that objections to "any amendment" or "supplement schedules" must likewise be filed within thirty days. Do these seemingly incongruous interpretations lead to an irreconcilable conflict in this instance? Both are entirely plausible and the hair's breadth of a difference in the rule's divergent 'plain meanings' is reflected in the almost equal division in outcomes among the reported cases. Which then, is the correct choice? On the facts of this case, the Court believes the question must be resolved in favor of a strict interpretation of both the rule and the statute it is intended to implement. *Taylor v Freeland & Kronz*, 503 U.S. 638, 643 (1992). That provision is Section 522(l). The rule's construction cannot override the statute's plain meaning.

Section 522(l) provides in pertinent part that, "Unless a party in interest objects, the property claimed as exempt on such list [the debtor's list of exemptions] is exempt." *See also Bell*, 225 F.3d at 215 (the effect of this self-executing exemption is to remove property from the estate and to vest it in the debtor).  As used in the Statute, the word 'objects' must mean a timely objection filed in accordance with Rule 4003(b)(1). *See Taylor v. Freeland & Kronz, Id.* at 642 (1992). Hence, in a case where a debtor exempts property by properly listing it on Schedule C, no timely objection is filed and there is no superseding statutory provision that operates to bring the property back into the estate, it is difficult to see how the property would not be fully vested in the debtor and therefore insulated from subsequent attack in a converted case.[34]  After all, Rule 4003 cannot abridge a substantive right. *See* 28 U.S.C. § 2075.

In the Court's view, this is precisely what happened here when the Debtor filed his Amended Exemption Schedule. Even under the most liberal interpretation of Rule 4003(b)(1) it cannot be denied that its initial thirty day time period had to begin to run (with respect to Debtor's Schedule C) when the Chapter 11 Section 341(a) meeting concluded. Thereafter, and no matter how nefarious his motivation may have been, the Debtor filed the Amended Exemption Schedule. On that day, July 24, 2007, Rule 4003(b)(1)'s second thirty day time

---

[34] In essence, that is *Taylor's* holding in a nutshell, save for the fact of conversion. *Id.* It is notable that in the context of the conversion of a Chapter 13, some cases have held that Section 1306, allied with Section 348(f), does operate to re-vest property in the estate at the point of conversion. *See, e.g., Hines*, 2008 Bankr. Lexis 2419 at *12-13 ("[I]n a case converted from Chapter 13 [to Chapter 7], Section 348(f)(1)(A) pulls the exempt property back into the estate at conversion, so long as it is still in the hands of the debtor. Section 522(l) does not apply until after the new 30-day period has run in the converted case."); *Campbell*, 313 B.R. at 321(noting that property that has re-vested in the debtor because of lack of timely objection or upon confirmation of a Chapter 13 plan, being property of the estate upon filing a Chapter 13 petition, is property of the Chapter 7 estate upon conversion under Section 348 (f) if it is still in the possession of the debtor); *but see In re Fonke*, 321 B.R. 199, 206-08. Recently enacted Section 1115, itself a part of the BAPCPA regime, is identical to Section 1306. Curiously though, no counterpart to Section 348(f) was codified in BAPCPA to correspondingly adjust the reach of Section 1115.

period began to run. When it ended, on August 23, 2007, PNC and the Trustee did object, but only partially. Neither of the two objections expressly disputed the Debtor's right to exempt the non-marital estate property.

There is no plausible way to interpret the word "amendment", as used in Rule 4003(b), as meaning anything but its common, ordinary definition.[35]  That is precisely what the Debtor's Paper No. 261 was – an amendment. Hence, whether the second Section 341(a) meeting of creditors following conversion might somehow hypothetically trigger new objection deadlines in another case, it is certain that because only a partial objection was filed and no extension of time was sought, the Trustee's Amended Objection was untimely. *See Taylor,* 503 U.S. at 642.  As there is no governing law that operates to bring exempt property back into the Estate under the circumstances presented here, any property that was properly exempted must be deemed to be the Debtor's free and clear of any claims of the Estate. *See In re Bell,* 225 F.3d at 215-16**;** *Smith v. Kennedy,* 235 F.3d 472, 478 (9th Cir. 2000); *In re Halbert*, 146 B.R. 185, 188 (Bankr. W.D. Tex 1992).

In his Supplemental Memorandum, the Trustee asserts that newly enacted Section 1115 serves to recapture exempt property during the course of a Chapter 11. That may well be so. However, the property in question did not become exempt during the Chapter 11 phase of this case. The exempt property was severed from the estate after the conversion of the case to Chapter 7 upon the expiration of the thirty day objection period, or, August 23, 2007. Pursuant to Section 103(g) subchapter I of Chapter 11 only applies "in a case under such chapter." Section 1115 is a part of subchapter I and therefore cannot control events following conversion to

---

[35] Black's Law Dictionary defines 'Amendment' as "[a] formal revision or addition proposed or made to a…pleading…or other instrument; specif., a change made by addition, deletion, or correction; esp., an alteration in wording." *Black's Law Dictionary* 89 (8th ed. 2004).

Chapter 7.  Plainly, there is no applicable provision in Chapter 7 that recaptures exempt property under these circumstances.

In the context of conversion from Chapter 11 to Chapter 7, cases that decide to re-trigger Rule 4003(b)(1)'s deadlines with the conclusion of the post-conversion Section 341(a) meeting of creditors begin their reasoning from the platform of a forthright, plain meaning interpretation of Section 341(a) and Rule 4003(b)(1). However, they neglect to adequately address the impact of Sections 522(l) and (c).[36] *See In re Brown*, 178 B.R. 722, 726-27 (Bankr. E.D. Tenn. 1995) (concisely elaborating upon that nagging Achilles' Heel). Moreover, they emphasize policy reasons over the Debtor's substantive rights in property.  These reasons essentially reduce to the unfairness of a debtor in possession being allowed to separate property from the estate before the propriety of exemptions is thoroughly examined by an independent trustee.

Admittedly, those reasons are compelling. However, in this case they have no relevance. In each reported decision, the exemptions were listed and the deadlines expired in the Chapter 11 phase of the case, prior to conversion.  *In re Lang*, 276 B.R. 716, 717 (Bankr. S.D. Fla. 2002); *In re Wolf*, 244 B.R. 754, 755 (Bankr. E.D. Mich. 2000); *In re Havanec*, 175 B.R. 920, 921-22 (Bankr. N.D. Ohio 1994); *In re Bergen*, 163 B.R. 377, 379 (Bankr. M.D. Fla. 1994).  In this case, however, the exemptions were listed by way of amendment immediately prior to the Trustee's appointment.  Hence, the Trustee was not presented with a *fait accompli*.  He had the opportunity to object (as he did in part), seek a Rule 2004 examination, request an extension of time, or perhaps all three. Under these circumstances, the Court sees no way around the strict language of Section 522(l) and the holding of *Taylor*. 503 U.S. at 643-44. Moreover, under the same reasoning, the claim that an objection is filed 'without prejudice' to the right to file a more comprehensive objection at a later date would likewise run contrary to *Taylor's* strict

[36] Section 522(c) insulates exempt property from liability for prepetition claims.

interpretation of Rule 4003(b)(1)'s deadlines.  A party cannot extend Rule 4003(b)(1)'s deadline

by mentioning that a further objection will be filed at a later date.  A timely request and court

order is required.  *See* Rule 9006(b)(3) (allowing for enlargement of time under Rule 4003(b)

only to the extent stated in that rule); Rule 4003(b)(1) (allowing an extension to be granted for

cause by request of a party in interest made prior to the expiration of the thirty day deadline);

*Taylor*, 503 U.S. at 643-44.  Hence, for all the reasons set forth above, the Trustee's Amended

Objection was untimely.  Nevertheless, the untimeliness shall not cause significant harm to the

Estate for the reasons explained below.

> **(C)**    **As a Matter of Law, the Trustee is Empowered to Administer Property**
> **Owned by the Debtor and his Wife as Tenants by the Entirety Based upon**
> **the Filing of Claims of Joint Creditors**

Debtor asserts that because the vast majority of the property he seeks to exempt is owned

as tenants by the entireties, said property is completely insulated from the Trustee's reach and

fully exemptible.  Assuming the property in question is owned as tenants by the entirety, the

conclusion drawn by Debtor is still wrong.  It is the long settled law of the Fourth Circuit that

tenants by the entirety property can be administered by the Trustee in an individual case if claims

of joint creditors are filed in the case. *Sumy v. Schlossberg*, 777 F.2d 921, 932 (4th Cir. 1985).  In

this case, the joint claims submitted into evidence by the Trustee at the hearing held on February

26, 2008 total approximately $3,904,140.40.[37]  Accordingly, the Trustee may administer and sell

the same for the benefit of joint creditors. *In re Williams*, 104 F.3d 688, 690 (4th Cir. 1997); *In re*

*Sefren*, 41 B.R. 747, 748 (Bankr. D. Md. 1984). This result is mandated whether the Trustee filed

a timely objection or not. *Williams,* 104 F.3d at 690. As stated by the court in *Williams*:

---

[37] The joint claims filed in this case appear to arise from various loan guaranties and
indemnity deeds of trust executed by the Debtor and his wife.

> [B]y specifically claiming an exemption under section
> 522(b)(2)(B), Williams merely claimed an exemption to which she
> *was* entitled – the exemption of her tenancy by the entirety from
> the claims of her non-joint creditors. *Taylor* does not purport to
> require a trustee to object to a claimed exemption to which the
> debtor is fully entitled.

*Id.* (emphasis in original).  Debtor's claim that the property may be fully exempted from the

Estate and severed free and clear of all claims because it is owned by he and his wife is therefore

erroneous as a matter of law and the Trustee may proceed to fully administer said property.

### (D)    The Debtor May Not Use Exemptions Available to Residents of Florida and Instead is Limited to Only Those Available to Maryland Residents

In his Response, the Debtor indicated that he purchased a condominium and wet boat slip

in Naples, Florida in April 2006.  On that basis, he seeks to avail himself of the exemptions

available to Florida residents. Again, the Petition Date in this case was September 26, 2006, five

months after the Debtor's purchase of a Florida condominium.[38]

Pursuant to Section 522(b)(3), (another BAPCPA addition to the Code) a debtor may

only claim exemptions available in the state in which the Debtor has been domiciled for the 730

days immediately prior to the date of the filing of the petition.  Plainly, Debtor's purchase of real

estate in Florida five months before the Petition Date does not qualify him as a domiciliary of

that state for purposes of choosing exemption law. Accordingly, the Debtor is limited to the

exemptions available in Maryland.

### (E)    The Value of Debtor's Exemptions are Limited by his Monetary Assignment of Value to the Same.

With respect to the balance of his non-tenants by the entirety property, Debtor sought to

exempt the same by using four separate groupings.  For his two cars, he seeks to exempt $3,000

---

[38] Notwithstanding the ownership of the Florida property, Debtor gave a substantial amount of cash to his wife post petition to enable her to purchase a home in Maryland in her name alone that they then both lived in.  That purchase was one link in the chain of transactions upon which the Trustee seeks the denial of the Debtor's discharge.

in value for each, while also assigning each car a market value of that amount.  He bases those exemptions on Md. Code Ann., Cts. & Jud. Proc. § 11-504(b)(1) and (b)(5).  Next the Debtor seeks to exempt $1,000 in value of wearing apparel also assigning it a market value in that amount and relying upon Md. Code Ann., Cts. & Jud. Proc. Art. § 11-504(b)(4).  Finally, Debtor lumped all of his non-tenants by the entirety property in a fourth grouping as follows:

> Any personal property that is not held as tenants by the entireties, including Debtor's interest in the J.P. Quillen Revocable Trust, all entities described under Item 13 of Schedule B and listed Riders B13 and B14, and all property described under Items 18 and 20 in Schedule B.

For this group, Debtor claimed a total exemption value of $11,000 and gave a market value of zero for these, mainly intangible, assets.  Debtor claims that this final group includes the $121,063.24 in proceeds remaining as a result of the sale of the Crossroads Interest.  Debtor claims that all of this property (including the entire $121,063.24) is his notwithstanding the monetary limit of $11,000 he assigned to this exemption category.

Debtor posits several different arguments in support of that claim.  However, each one reduces to the assertion that the exemption values assigned by the Debtor (and the corresponding statutory caps) are irrelevant to the value of the Debtor's exemptible interest.[39]  In other words, Debtor's exemption of a defined monetary amount of 'property' does not limit his right to recover all the subject property.

The holding in *In re Forti*, 224 B.R. 323 (Bankr. D.Md. 1998) compels the opposite result.  As written by Judge Derby in that well reasoned opinion, "when a debtor assigns a dollar

---

[39] Debtor's claim that the Crossroads interest was not actually worth the amount it was re-purchased for at the beginning of the case and, moreover, can be proven to be zero is patent nonsense. To agree with the Debtor's contention would require the Court to dive straight down Alice's rabbit hole and ignore the reality of how the Crossroads Interest was converted into cash. The Crossroads Interest gained its market value precisely because of the filing of the petition and is therefore worth exactly what was paid for it thereafter at the Debtor's behest.

value to an interest that the debtor is claiming as exempt, the debtor's exemption is limited to that value." *Id.* at 326-27. Because the debtor in that case assigned zero dollars as exemption values to several items of property, the actual exemption amounts were limited to that designation - zero. *Id.* There is no need to rehash Judge Derby's reasoning here. It is impeccable as always and applies directly to Mr. Quillen's exemptions. *See also In re Herbert,* 2001 WL 1739180 (Bankr. D. Md. 2001) (in assigning a zero dollar value to an asset claimed exempt, a debtor is limited to that claimed exemption value—i.e., a debtor's interest in the asset is exempt only to the extent of zero dollars); *In re Grablowsky*, 149 B.R. 402 (Bankr. E.D. Va. 1993), *aff'd*, 158 B.R. 53 (E.D. Va. 1993), *aff'd*, 32 F.3d 562 (4th Cir. 1994) (per curiam) (same, except that the debtor assigned a value of one dollar to a partnership interest and was limited to an exemption in that amount).

Debtor's exemptions in this case will be limited in the same way Mr. and Mrs. Forti's were—by the claimed exemption values that he declared in his Amended Exemption Schedule. Accordingly, the Debtor's exemptions shall be allowed but only to the extent of the amounts claimed by the Debtor. [40]

### IV. Conclusion

In conclusion, the Debtor's Amended Exemption Schedule will be permitted but only as allowed by law as set forth in this Opinion. The Trustee shall be permitted to administer the Debtor's claimed tenants by the entireties property. The Debtor's other exemptions shall be

---

[40] The Trustee's untimely objection asserted that the Debtor could not exempt monetary value beyond the Maryland statutory limits he listed. However, since the Amended Objection will be stricken as untimely, it would seem that the holding of *Taylor* requires the Court to permit the Debtor to take the total value claimed exempt ($18,000) in non-marital estate property even if it is not permitted by the governing statute. *Taylor*, 503 U.S. at 643-44.

allowed but only to the extent of the exemption values assigned the property by the Debtor.  In

other words, Debtor will be permitted to keep his cars and clothing and will receive $11,000

from the Estate.[41]   A separate order memorializing these rulings shall issue.

cc:      James Paul Quillen, Jr.
         909 10th Street South, Unit 201
         Naples, Florida 34102

         Joel I. Sher, Esquire
         Shapiro Sher Guinot & Sandler
         36 S. Charles Street
         20th Floor
         Baltimore, MD 21201
         *Attorneys for Zvi Guttman, Chapter 7 Trustee*

         Michael G. Gallerizzo, Esquire
         Michael C. Bolesta, Esquire
         Gebhardt & Smith
         One South Street, Suite 2200
         Baltimore, MD 21202
         *Attorneys for PNC Bank, National Association,*
         *Successor-by-Merger to Mercantile-Safe Deposit and Trust Company*

         Katherine A. Levin, Esquire
         Office of the U.S. Trustee
         Garmatz Federal Courthouse
         101 West Lombard Street
         Suite 2625
         Baltimore, MD 21201


**End of Order**

---

[41] Notwithstanding the Debtor's written caveats in the Amended Exemption Schedule, he specifically altered his Schedule C exemption by redesignating it as tenants by the entirety in the Amended Exemption Schedule.  The Trustee shall therefore be permitted to administer that property and the Debtor shall not be allowed to double dip.

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### (Northern Division)

| | | |
|---|---|---|
| In Re: | * | Case No. 06-15938RAG |
| | * | (Chapter 11) |
| James P. Quillen, Jr. | * | |
| | * | |
| Debtor | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## DEBTOR'S AMENDMENT TO SCHEDULE C

The above named debtor hereby amends Schedule C of Debtor's schedule of assets and liabilities to list property that may be exempted that Debtor now desires to exempt that was not listed as exempt and to amend the claim of exemption as originally filed. Except as amended herein, the Schedule C as originally filed shall remain in full force and effect.

### Amendment to Schedule C – Property Claimed As Exempt

| Description of Property | Specify Law Providing each exemption | Value of claimed exemption | Current market value of property with deducting exemptions |
|---|---|---|---|
| All jewelry & artwork listed in the attachment to Schedule B | 11 U.S.C. 522(b)(3)(B)<br><br>Property is tenants by the entireties under Maryland law | $350,000 | $350,000 |
| Wet Slip 34 in Naples Boat Club Naples, Florida | 11 U.S.C. 522(b)(3)(B)<br><br>Property is tenants by the entireties under both Maryland & Florida law | $300,000 | $300,0000 (excludes secured claims) |

APPENDIX "A"

| | | | |
|---|---|---|---|
| Condo Unit 201 Naples Boat Club 909 10th Street South Naples, Florida | 11 U.S.C. 522(b)(3)(B)<br><br>Property is tenants by the entireties under both Maryland & Florida law | $1,900,000 | $1,900,000 (excludes secured claims) |
| All household goods & furnishings described under Item 4 to Schedule B | 11 U.S.C. 522(b)(3)(B)<br><br>Property is tenants by the entireties under both Maryland & Florida law | $25,000 | $25,000 |
| All items described under Item 5 to Schedule B that are not specifically listed in the attachment to Schedule B | 11 U.S.C. 522(b)(3)(B)<br><br>Property is tenants by the entireties under both Maryland & Florida law | $5,000 | $5,000 |
| All items described under Item 8 to Schedule B | 11 U.S.C. 522(b)(3)(B)<br><br>Property is tenants by the entireties under Maryland law | $1,000 | $1,000 |
| 2000 Acura RL | 11 U.S.C. 522(b)(3)(A)<br><br>Md. Code Ann., Cts & Jud. Proc. 11-504(b)(1) | $3,000 | $3,000 |
| 2001 Mitsubishi Montero | 11 U.S.C. 522(b)(3)(A)<br><br>Md. Code Ann., Cts & Jud. Proc. 11-504(b)(5) | $3,000 | $3,000 |
| Wearing Apparel | 11 U.S.C. 522(b)(3)(A) | $1,000 | $1,000 |

| | | | |
|---|---|---|---|
| | Md. Code Ann., Cts. & Jud. Proc. 11-504(b)(4) | | |
| Any personal property that is not held as tenants by the entireties, including Debtor's interest in the J.P. Quillen Revocable Trust, all entities described under Item 13 of Schedule B and listed in Riders B13 and B14, and all property described under Items 18 and 20 in Schedule B | 11 U.S.C. 522(b)(3)(A)<br><br>Md. Code Ann., Cts. 7 Jud. Proc. 11-504(b)(1), 504(b)(5) & 504(f) | $11,000 | zero |
| Bank of America Bank Account | 11 U.S.C. 522(b)(3)(B)<br><br>Property is tenants by the entireties under both Maryland & Florida law | $3,000 | $3,000 |

Dated:  July 24, 2007

James P. Quillen, Jr., Debtor
711 Jaclyn Circle
Freeland, Maryland  21053
239-465-0314
239-331-5250 – Facsimile
jpquillen@quillendevelopment.com

3

## VERIFICATION

I, James P. Quillen, Jr., the debtor named in the above-entitled case, declare under penalty of perjury that I have read the foregoing amendment to Schedule C, consisting of 4 sheets and that the statements contained therein are true and correct to the best of my knowledge, information and belief.

Executed on July 24, 2007

_____
James P. Quillen, Jr., Debtor

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 24th day of July, 2007, a copy of the foregoing Amendment to Schedule C was served electronically to those parties in interest included on the Court's ecf system and served by first class mail, postage prepaid to all creditors and parties listed on the creditor mailing matrix.

_____
James P. Quillen, Jr.

4